# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN H. KLEIN and CAMBRIDGE THERAPEUTIC TECHNOLOGIES, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2017-0643-KSJM |
| MARC WASSERMAN, ROBERT BRESLOW, and MONICA BRESLOW, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 14, 2019
Date Decided: May 29, 2019

Michael F. Bonkowski, Andrew L. Cole, COLE SCHOTZ P.C., Wilmington, Delaware; Steven R. Klein, Rachel A. Mongiello, COLE SCHOTZ P.C., Hackensack, New Jersey; *Counsel for Plaintiffs John H. Klein and Cambridge Therapeutic Technologies, LLC*.

Lisa A. Schmidt, Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Joseph L. Fogel, Michael P. Kornak, FREEBORN & PETERS LLP, Chicago, Illinois; *Counsel for Defendants Marc Wasserman, Robert Breslow, and Monica Breslow*.

**McCORMICK, V.C.**

In June 2016, defendants Monica and Robert Breslow invested $12.5 million in plaintiff Cambridge Therapeutic Technologies, LLC ("CTT"). The plaintiffs allege that after investing, the Breslows exhibited buyer's remorse. They pressed for a buy-out of their equity stake and, to achieve this outcome, enlisted the aid of their board nominee, Marc Wasserman. According to the plaintiffs, through Wasserman, the Breslows embarked on a bad faith campaign to disrupt CTT's operations as much as possible. Wasserman demanded that CTT allocate tax losses to the Breslows, circumvented protocol by requesting information directly from employees, threatened litigation to obtain that information, and interfered with CTT's efforts to raise additional capital. The plaintiffs allege that Wasserman's actions caused internal disruption, hostility, and instability, as well as delays in filing K-1 tax statements. To boot, CTT's tax accountants and Chief Financial Officer resigned. But the Breslows never obtained a buy-out.

Instead, CTT's founder John H. Klein caused CTT to commence this litigation. CTT alleges that Wasserman breached his fiduciary duty of loyalty by placing the Breslows' interests ahead of the best interests of CTT and that the Breslows aided and abetted in Wasserman's disloyal actions. CTT further alleges that the Breslows owed fiduciary duties as controllers of CTT, which they breached. In the alternative, CTT contends that the defendants breached the implied covenant of good faith and fair dealing inherent in CTT's operating agreement.

1

The defendants have moved to dismiss the amended complaint, and this decision grants that motion as to the majority of the plaintiffs' claims. Whittled down to size, the amended complaint states a claim for breach of fiduciary duty against Wasserman and for aiding and abetting against the Breslows. Wasserman owed a duty to advance the best interests of CTT. Under the plaintiff-friendly pleading standard, it is reasonably conceivable that Wasserman breached duties to CTT by engaging in a course of conduct to benefit the Breslows and harm CTT. Given the nature of Wasserman's alleged acts, it is also reasonably conceivable that the Breslows knowingly participated in Wasserman's actions.

The amended complaint, however, does not adequately allege facts sufficient to impose fiduciary duties on the Breslows as controllers. At bottom, the plaintiffs argue that the Breslows used their sources of influence—their board designee and his blocking rights under the operating agreement—to disrupt CTT's operations to a level sufficient to force a buy-out. Some theories posit that chronic disruption could rise to the level of control. Take Trotskyism, for example. The allegations in this case do not support such a holding. The amended complaint itself describes the Breslows as on a "quest" for control, not wielding control. The Breslows never achieved their alleged goal. At best, CTT pleads that the Breslows successfully disrupted CTT, but not to a degree that would support a reasonable inference of control.

2

CTT's claim for breach of the implied covenant of good faith and fair dealing likewise fails. Courts invoke the implied covenant to fill contractual gaps concerning developments that the parties did not anticipate. In this case, CTT identifies no gaps that require filling. The plaintiffs argue that the Breslows promised, before executing the operating agreement, to deliver certain clients to CTT. That alleged promise, however, was known and could have been expressly addressed in the agreement; it is not a promise the Court may enforce by implying terms now.

Klein is also a plaintiff in this case. After CTT commenced this litigation, Mark Adams (Klein's own Board nominee) and Wasserman voted to remove Klein from his management positions at CTT. Klein subsequently alleged that the defendants tortiously interfered with Klein's employment agreement and engaged in civil conspiracy. Both of these claims fail. To state a claim for tortious interference with his rights under the employment agreement, or a civil conspiracy claim based on that tortious interference, Klein must adequately allege that CTT breached his employment agreement. Because Klein does not allege facts to establish a contractual breach, both the claim for tortious interference and conspiracy lack a necessary predicate.

# I. FACTUAL BACKGROUND

The facts are drawn from the amended complaint[1] and documents incorporated therein.

## A. CTT, Its Members, and Its Management Structure

CTT is a Delaware limited liability company headquartered in Teaneck, New Jersey. CTT packages and distributes pharmaceuticals, with a focus on "creating cost effective innovative medication delivery and packaging systems designed to improve patient medication adherence."[2]

CTT has three classes of units—A, B, and C. Only Class A units carry voting rights. Klein owns 37,000 Class A units, which is a majority of the Class A units and CTT's voting equity. Defendants Robert and Monica Breslow own 20,000 Class A units. Non-party Blue Valley, LLC ("Blue Valley") owns 9,111 Class A units. Another non-party owns 8,000 Class A units.

The Breslows acquired their units for $12.5 million in June 2016. The plaintiffs allege that before the Breslows acquired a stake in CTT, they represented that they had "'substantial' connections to numerous dental clinics" and "that they would 'bring' 105 [such] . . . contacts to CTT."[3]

---

[1] C.A. No. 2017-0643-KSJM Docket ("Dkt.") 14, Pls.' Am. Compl. ("Amended Complaint" or "Am. Compl.").

[2] *Id.* ¶ 7.

[3] *Id.* ¶¶ 13–14.

**B.     The Operating Agreement**

In connection with the Breslows' investment, CTT's members executed an operating agreement in June 2016 (as amended in September 2016, the "Operating Agreement").[4]

The Operating Agreement establishes a three-person Board of Managers (the "Board") to manage CTT's business and affairs.  Of the three Board managers, Klein appoints two and the Breslows appoint one.  At the time of the events prompting this litigation, the Board comprised Klein (Chairman), Adams (designated by Klein), and Wasserman (designated by the Breslows).  Neither Wasserman nor Adams is currently a Board member.

The Operating Agreement permits the Board to appoint a CEO.  Klein served as CEO and President pursuant to a June 2014 employment agreement that was amended at the time of the Breslows' investment (the "Employment Agreement").  Klein served in those capacities until December 14, 2017, when Adams and Wasserman voted to remove Klein for cause.

The Operating Agreement conditions certain business decisions on Board approval and the affirmative vote of the Breslows' Board designee.  These decisions include making investments outside the approved Board policy, incurring capital

---

[4] Am. Compl. Ex. A, Am. and Restated Operating Agreement of CTT ("Operating Agr.").

expenditures over $250,000, and merging, selling, or liquidating all or a substantial portion of the company's assets.

### C. The Alleged Campaign to Force a Buy-Out

Blue Valley acquired its units for $7 million in September 2016 at a substantially higher valuation than the Breslows' investment. The Amended Complaint alleges that after Blue Valley invested, the Breslows "became anxious to extract an immediate return" or "exit their investment" in CTT.[5] CTT says that Wasserman and the Breslows "began a bad faith campaign intended solely to disrupt CTT's business operations with the hopes that the Breslows could gain control of CTT or force a buy-out of their interest in CTT."[6]

The factual allegations concerning the putative campaign fall into four categories.

*First*, Wasserman made multiple demands on the Board designed to further the Breslows' interests. Wasserman demanded: "that CTT allocate its full tax losses to the Breslows";[7] that "the [Board] authorize a buyout of the Breslows' ownership interest, even though CTT lacked sufficient working capital to support any such payment";[8] and that the Board approve a "transaction" with "a potential third-party

---

[5] Am. Compl. ¶ 36.

[6] *Id.* ¶ 39.

[7] *Id.* ¶ 42.

[8] *Id.* ¶ 45.

6

investor" "without conducting any diligence or negotiating the terms of the deal, contrary to the best interests of CTT . . . ."[9]  Wasserman also "criticized" CTT's decision to switch software providers and "blamed others for supposedly harming" CTT.[10]

The Board took no action on these demands or criticisms.  When CTT and its Board rejected Wasserman's tax allocation demand, Wasserman "created immense animosity and conflict within CTT, ultimately leading CTT's tax accountants to resign and causing delays in filing the Company's K1 statements."[11]

*Second*, Wasserman made information demands on CTT employees designed to disrupt CTT operations.  Wasserman "incessantly" requested "information" about the company, which distracted people from their jobs and created "hostility throughout CTT."[12]  If Wasserman did not receive immediate responses, he threatened CTT and its officers with litigation and "other adverse employment actions."[13]  CTT's Chief Financial Officer resigned due to Wasserman's information demands.

---

[9] *Id.* ¶ 53.

[10] *Id.* ¶ 54.

[11] *Id.* ¶ 43.

[12] *Id.* ¶¶ 46–47, 49.

[13] *Id.* ¶ 48.

*Third*, Wasserman refused to allow the Board to "consider potential investments that would provide needed capital."[14] Wasserman blocked these "transactions" because they "were not in the Breslows' best interest[,]" according to the Amended Complaint.[15] CTT "could have potentially benefitted from exploring these business opportunities more fully."[16] CTT does not identify with any detail the alleged "transactions," how they were considered, or when they were refused.

*Fourth*, Wasserman and Adams terminated Klein as CEO and President in December 2017. CTT and Klein allege that Wasserman and the Breslows "were able to coopt Adams"[17] to vote to remove Klein "through guile" and "by exerting pressure through false representations."[18] As a result of this conduct, Klein suffered financial losses[19] and CTT suffered disruption, instability, and "harm to normal business operations."[20]

### D. This Litigation

The plaintiffs commenced this litigation in September 2017. The defendants moved to dismiss the initial complaint in October 2017. The Board removed Klein

---

[14] *Id.* ¶ 52.

[15] *Id.*

[16] *Id.*

[17] *Id.* ¶ 62.

[18] *Id.* ¶¶ 62, 86.

[19] *Id.* ¶¶ 58–59, 67–68.

[20] *Id.* ¶ 69.

as CEO in December 2017. The plaintiffs amended their complaint in April 2018 in response to the motion to dismiss and to add claims concerning Klein's removal. The defendants renewed their motion to dismiss in June 2018. The parties completed briefing in September 2018,[21] and the Court heard oral arguments on February 14, 2019.[22]

## II. ANALYSIS

The Amended Complaint asserts five counts: three by CTT and two by Klein. In Count I, CTT asserts a claim for breach of fiduciary duty against Wasserman as a manager and the Breslows as controllers. In Count II, CTT asserts a claim against the Breslows for aiding and abetting Wasserman's breach of fiduciary duties. In Count III, CTT asserts a claim against all defendants for breach of the implied covenant of good faith and fair dealing. In Count IV, Klein asserts a claim against all defendants for tortious interference with his Employment Agreement. In Count V, Klein asserts a claim against all defendants for civil conspiracy.

The breach of fiduciary duty claims asserted in the Amended Complaint are typically pursued derivatively by an investor. By contrast, here, the entity possessing the claims—CTT—is a named plaintiff and pursues those claims in its

---

[21] Dkt. 18, Opening Br. in Supp. of Defs.' Mot. to Dismiss the Am. Verified Compl. ("Defs.' Opening Br."); Dkt. 20, Pls.' Answering Br. ("Pls.' Ans. Br."); Dkt. 21, Reply Br. in Supp. of Defs.' Mot. to Dismiss Pls.' Am. Verified Compl. ("Defs.' Reply Br.").

[22] Dkt. 35.

own right. As a result, the Amended Complaint is not subject to the heightened pleading requirements of Court of Chancery Rule 23.1. Thus, the defendants' motion to dismiss is governed by Court of Chancery Rule 12(b)(6).

On a motion pursuant to Rule 12(b)(6), the Court accepts "all well-pleaded factual allegations in the Complaint as true, [and] accept[s] even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim."[23] "A trial court is not, however, required to accept as true conclusory allegations 'without specific supporting factual allegations.'"[24] The Court "draw[s] all reasonable inferences in favor of the plaintiff[s], and den[ies] the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[25]

### A. CTT's Claim for Breach of Fiduciary Duties

#### 1. Against Wasserman as Manager

Count I alleges that Wasserman breached his fiduciary duties as a manager of CTT. By default, limited liability company managers owe fiduciary duties akin to

---

[23] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[24] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995); *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del. 1996)).

[25] *Cent. Mortg.*, 897 A.2d at 168 (citation omitted).

those owed by directors of a corporation.[26] Although Delaware law permits a limited liability company to eliminate fiduciary duties in the governing agreement,[27] CTT's Operating Agreement does not do so.[28] The Operating Agreement does contain exculpatory language. The practical effect of that language is that, to survive a motion to dismiss, CTT must plead that Wasserman acted in bad faith, recklessly, fraudulently, or with willful malfeasance.[29]

CTT's allegations against Wasserman target the bad faith aspect of this standard. The duty to act in good faith requires "true faithfulness and devotion,"[30] "'honesty of purpose,' and a genuine care for the fiduciary's constituents[.]"[31] Bad faith, on the other hand, includes "fiduciary conduct motivated by an actual intent to

---

[26] 6 *Del. C.* § 18-1104; H.R. 126, 147th Gen. Assemb. Reg. Sess. (Del. 2013) ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties . . . shall govern.") (underlining in original).

[27] 6 *Del. C.* § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement[.]").

[28] Operating Agr. §§ 9.1–9.2.

[29] *Id.* § 9.2(a) (eliminating personal liability of members and managers for "any action taken, or omitted to be taken, in good faith . . . except and only to the extent of such Covered Person's own recklessness, fraud, or willful malfeasance, and, with respect to any criminal action . . . .").

[30] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

[31] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 753 (Del. Ch. 2005) (citation omitted), *aff'd*, 906 A.2d 27 (Del. 2006).

11

do harm,"[32] or actions taken "with a purpose other than that of advancing the best interests of the corporation . . . ."[33]

In support of dismissal, the defendants adopt a divide-and-conquer approach, urging the Court to evaluate CTT's allegations of bad faith piecemeal, and conclude that because no single allegation suffices to support a claim for breach of fiduciary duty, the collection of CTT's allegations likewise fail. At the pleadings stage, this Court does not review in piecemeal fashion, but rather, reads the allegations as a whole.[34]

Reading CTT's allegations as a whole, it is reasonably conceivable that Wasserman acted in bad faith by placing the interests of the Breslows above the interests of CTT. Wasserman allegedly demanded that the Board allocate its full tax

---

[32] 906 A.2d at 64.

[33] *Id.* at 67; *see also Personal Touch Hldg. Corp. v. Glaubach*, 2019 WL 937180, at *24 (Del. Ch. Feb. 25, 2019).

[34] *See, e.g.*, *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 17 (Del. Ch. 2009) ("I recognize that each of the allegations in the Complaint, when viewed separately and in isolation, can be minimized. . . . My task at the pleadings stage, however, is not to weigh competing inferences but rather to draw reasonable inferences in favor of the plaintiff."); *Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *7 (Del. Ch. Aug. 30, 2013) ("None of these allegations viewed individually is demonstrative of bad faith. Taken as a whole, however, they convince me that it is reasonably conceivable [the defendant] failed to act in good faith . . . ."); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 729 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) ("The process pursued by the Director Defendants that is reflected in the Complaint, considered as a whole and taking as true the well-pleaded allegations of fact, provides no support for any inference of bad faith or disloyalty."); *Norman v. Paco Pharm. Servs., Inc.*, 1989 WL 110648, at *10 (Del. Ch. Sept. 22, 1989) ("A reading of the Complaint as a whole . . . gives the defendants adequate notice of the basis of their alleged wrongdoing.").

losses to the Breslows and authorize a buyout of the Breslows' ownership interest. Wasserman also allegedly demanded information from employees directly, thereby bypassing ordinary channels and disrupting operations. Harm conceivably flowed from this alleged misconduct: CTT's tax accountants and Chief Financial Officer resigned; CTT suffered delays in filing K-1 tax statements; and Wasserman's actions disrupted and destabilized CTT.[35]

Delaware courts have recognized that a course of conduct designed to disrupt the operations of a company may constitute a breach of fiduciary duty. In *BelCom, Inc. v. Robb*, for example, former Chancellor Chandler found post-trial that a director of BelCom, Inc. breached his duty of loyalty by engaging in a "campaign of harassment" designed to "extract millions" from the company.[36] In *BelCom*, the campaign involved threatening litigation against the company, and then demanding

---

[35] Am. Compl. ¶¶ 43–44, 46–47, 50, 69–70. CTT's allegations regarding Wasserman portray a mish mash of conduct, some of which crosses over the line, and some of which seems appropriate. In the inoffensive category, CTT alleges that Wasserman requested information from CTT management "incessantly." *Id.* ¶ 46. A board member repeatedly requesting information is not a bad thing; board members are responsible for the business and affairs of the company and typically enjoy virtually "unfettered" access to company books and records for this reason. *Red Capital Inv. L.P. v. Red Parent LLC*, 2016 WL 612772, at *4 (Del. Ch. Jan. 15, 2016). Likewise, CTT alleges that Wasserman expressed "criticisms" and "blame[]" during a board meeting. Expressing criticisms at a board meeting is not inherently wrongful conduct; in fact, failing to express dissent when appropriate can be more dangerous. In isolation, these allegations do not offend the Court or support CTT's claim for breach of fiduciary duties.

[36] 1998 WL 229527, at *1 (Del. Ch. Apr. 28, 1998).

that employees obtain indemnification agreements to defend against the litigation, which caused key employees to refuse to continue working for the company.[37]

Likewise, in *Auriga Capital Corp. v. Gatz Properties, LLC*, then-Chancellor Strine found post-trial that a manager breached his fiduciary duties by engaging in a "course of conduct to enrich himself and his family without any regard for the interests" of the company or its minority members.[38] In *Auriga*, the course of conduct involved avoiding strategic options, refusing to provide corporate information to potential bidders, failing to take any steps to preserve the value of the company, and using contractual veto rights as a "chokehold" over the LLC.[39]

As in *BelCom* and *Auriga*, the Amended Complaint alleges that Wasserman repeatedly used his powers as a manager, including his ability to interact with key employees and exercise contractual veto rights, to further goals not in the company's best interests. To be sure, both *BelCom* and *Auriga* involve bad actions a degree more severe than those described in the Amended Complaint. In both cases, the Court found that the fiduciary had committed flagrant fraud, which CTT does not plead in this case. But both decisions were decided post-trial upon a fully developed record. In this case, a more complete record might reveal more egregious facts; it

---

[37] *Id.* at *2.

[38] 40 A.3d 839, 859 (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012).

[39] *Id.* at 843.

might not. At the pleadings stage, giving CTT all inferences to which it is entitled, the Amended Complaint states a non-exculpated claim for breach of fiduciary duty against Wasserman.

The defendants' other arguments in support of dismissal are similarly unavailing. The defendants describe CTT's allegations concerning Wasserman's course of conduct as conclusory. Conclusory allegations are those that "state[] a generalized conclusion with no supporting facts."[40] By contrast, the Amended Complaint points to specific events demonstrating the alleged campaign, including demands on the Board. CTT's allegations concerning the alleged campaign could be more detailed, but a lack of detail does not render an allegation conclusory.[41]

The defendants further argue that CTT's claims are not ripe because the Board did not consummate any transaction that Wasserman demanded. Consequently, in CTT's words, there is no "actionable harm."[42] The mere fact that the Board did not

---

[40] *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *2 (Del. Ch. Oct. 17, 2007). Conclusory statements are "bald assertion[s]," *id.*, "amorphous allegation[s]," *id.* at *4, or "threadbare" recitals that fail to support an inference of a claim, *MHS Capital LLC v. Goggin*, 2018 WL 2149718, at *14 (Del. Ch. May 10, 2018). *See also UtiliSave, LLC v. Miele*, 2015 WL 5458960, at *10 (Del. Ch. Sept. 17, 2015); *L A P'rs, L.P. v. Allegis Corp.*, 1987 WL 14531, at *6 (Del. Ch. Oct. 22, 1987).

[41] Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 4.06[b][1], at 4–18 (2018) (citing *Diamond State Tel. Co. v. Univ. of Delaware*, 269 A.2d 52, 58 (Del. 1970); *Morgan v. Wells*, 80 A.2d 504, 505 (Del. Ch. 1951) ("Vagueness or lack of detail are not sufficient grounds alone to dismiss a complaint for failure to state a claim.")).

[42] Defs.' Reply Br. at 10.

15

act on Wasserman's demands, however, does not defeat CTT's claim at the pleadings stage. Although it is true that the Court may not issue advisory opinions determining the legal sufficiency of a transaction that a company has not committed to pursue, CTT does not seek that relief. Rather, CTT points to those proposed transactions as evidence that Wasserman was acting in a systematic manner to benefit the Breslows and not CTT.

In any event, CTT has pled harm. CTT alleges that because Wasserman disregarded CTT protocol by making direct demands on employees, requesting immediate responses, and threatening some employees with adverse employment actions, CTT suffered. Specifically, key persons resigned and CTT experienced delays in filing documents.[43] CTT further alleges that Wasserman's actions caused internal disruption and corporate instability. CTT will have the burden of proving these allegations at a later stage, and that might be difficult. At the pleadings stage, however, these allegations are sufficient.

The defendants' motion to dismiss Count I as to Wasserman is denied.

---

[43] In briefing, CTT contends that it suffered "damage to CTT's reputation and business relationships[.]" Pls.' Ans. Br. at 23. But these facts are not alleged in the Amended Complaint, and so they are not appropriately before the Court on the defendants' motion to dismiss. *See Orman v. Cullman*, 794 A.2d 5, 28 n.59 (Del. Ch. 2002).

16

## 2. Against the Breslows as Controllers

Count I also claims that the Breslows owe fiduciary duties as controllers of CTT and that the Breslows breached those duties. Under Delaware law, the controllers of a limited liability company owe fiduciary duties absent contractual modification.[44] The Operating Agreement does not eliminate the fiduciary duties of controllers. Accordingly, CTT can state a claim for breach of fiduciary duty against the Breslows as controllers if CTT alleges facts that, if accepted as true, would be sufficient to establish control.

One way to establish control is to show that the alleged controller exercises a majority interest in outstanding stock.[45] The Breslows, who own only 20% of CTT's voting equity, do not control CTT under this standard.

---

[44] *Glidepath Ltd. v. Beumer Corp.*, 2019 WL 855660, at *18 (Del. Ch. Feb. 21, 2019) (holding that a controller of an LLC owed fiduciary duties); *Cancan Dev., LLC v. Manno*, 2015 WL 3400789, at *23 (Del. Ch. May 27, 2015) (same); *In re Atlas Energy Res.*, 2010 WL 4273122, at *6 (Del. Ch. Oct. 28, 2010) ("Delaware's case law clearly teaches that, 'in the absence of provisions in the LLC agreement explicitly disclaiming the applicability of default principles of fiduciary duty, controlling members in a manager-managed LLC owe minority members the traditional fiduciary duties that control shareholder owe minority shareholders.'" (quoting *Kelly v. Blum*, 2010 WL 629850, at *12 (Del. Ch. Feb. 24, 2010))); *accord Beach to Bay Real Estate Ctr. LLC v. Beach to Bay Realtors Inc.*, 2017 WL 2928033, at *5 (Del. Ch. July 11, 2017) (dismissing claims for breach of fiduciary duties where minority membership was the "*sole* allegation" in support of control (emphasis added)).

[45] *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994) (discussing control in the corporate context) (citations omitted). The principles underlying control analyses in the corporate context also apply to such analyses conducted in the limited liability company context.

Another way to establish control is for the plaintiff to show that the defendant exercises "actual control"[46] or "control over the business and affairs of the corporation."[47]  Actual control can be shown to exist (i) generally or (ii) with regard to the particular transaction or decision.[48]  This decision refers to the two types of actual control as "general control" and "decision-specific control."

To demonstrate general control, the plaintiffs may show that "as a practical matter," the alleged controllers "are no differently situated than if they had majority voting control."[49]  To accomplish this, a plaintiff may show that the equity holder "possesses a combination of . . . voting power and managerial authority that enables him to control the [company], if he so wishes."[50]  Showing "effective control of the board" may also establish general control.[51]

CTT does not allege facts sufficient to show that the Breslows exercised general control over CTT.  The Breslows own a 20% voting interest, do not hold any

[46] *In re Rouse Props., Inc.*, 2018 WL 1226015, at *11–12 (Del. Ch. Mar. 9, 2018).

[47] *Id.* at *11 (internal quotation marks omitted) (emphasis removed).

[48] *Id.* at *12 (citations omitted).

[49] *In re PNB Hldg. Co. S'holder Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).

[50] *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003); *see Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006) ("[T]he focus of the inquiry has been on the *de facto* power of a significant (but less than majority) shareholder, which, when coupled with other factors, gives that shareholder the ability to dominate the corporate decision-making process." (emphasis original)).

[51] *See Olenik v. Lodzinski*, --- A.3d ---, 2019 WL 1497167, at *10 (Del. Apr. 5, 2019) (describing "effective control of the board" as a means to establish controlling status).

office or management position at CTT, are not CTT directors, and, at most, control one of three Board members.[52] Moreover, Klein actually wields the majority of CTT's voting power and is wholly independent from (and, indeed, antagonistic to) the Breslows. CTT cannot argue that the Breslows are no differently situated than Klein.

To demonstrate decision-specific control, CTT argues that the Breslows controlled CTT by "channel[ing] the corporation into a particular outcome by blocking or restricting other paths[.]"[53] Relatedly, they argue that the Breslows created as much disruption as possible to force their desired outcome.[54]

CTT does not allege facts sufficient to show decision-specific control under a channeling or disruption theory. One key problem is that CTT is vague as to the

---

[52] The Amended Complaint does not allege any specifics as to Wasserman's relationship with the Breslows. This analysis has assumed that Wasserman lacked independence from the Breslows without concluding that the facts alleged are sufficient to support that assumption.

[53] Pls.' Ans. Br. at 34 (citing *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *26 (Del. Ch. July 6, 2018)). The full quote from *Basho* lists "the exercise of contractual rights" as an example of a source of influence used "to channel the corporation into a particular outcome . . . ." *Id*. (emphasis added). CTT downplays the role of contractual blocking rights in its theory, arguing that Wasserman's alleged bad faith campaign, "*in conjunction with*" the contractual blocking rights, are what steered CTT toward "a particular outcome." Pls.' Ans. Br. at 35 (emphasis added).

[54] Am. Compl. ¶¶ 43–48.

decision or "particular outcome" that the Breslows *successfully* achieved.[55]  As pled, the Breslows' sole goal was to "monetize their individual investment as soon as possible"[56] and obtain "a buyout of their interests."[57]  Indisputably, the Breslows never achieved that outcome.

Theoretically, actions implementing aspects of a larger strategy could themselves supply the particular outcomes to support a theory of decision-specific control.  In this case, CTT presents two successful "outcomes"—blocking capital infusions and removing Klein.

As to the first, CTT argues that Wasserman wielded his contractual blocking rights to foreclose capital infusions.[58]  But the Amended Complaint does not identify

---

[55] In briefing, CTT makes one argument for control, ostensibly to show *both* general and decision-specific control. *See, e.g.*, Pls.' Ans. Br. at 35 (arguing for control "both in general and as to the transactions at issue").

[56] Am. Compl. ¶ 3.

[57] *Id.* ¶ 5.

[58] Although this decision need not wade into the area given the paucity of supporting allegations, the premise of CTT's argument—that contractual blocking rights can serve as a source of control—presents an interesting issue under Delaware law.  *Compare Thermoplylae Capital P'rs v. Simbol*, 2016 WL 368170, at *13 (Del. Ch. Jan. 29, 2016) (holding that "[u]nder Delaware law . . . contractual rights held by a non-majority stockholder do not equate to control, even where the contractual rights allegedly are exercised by the minority stockholder to further its own goals"), *with Superior Vision*, 2006 WL 2521426, at *5 (stating that "[t]here may be circumstances where the holding of contractual rights, coupled with a significant equity position or other facts, will support the finding that a particular shareholder is, indeed, a 'controlling shareholder,' especially if those contractual rights are used to induce or coerce the board of directors to approve (or refrain from approving) certain actions," but explaining that "a significant shareholder, who exercises a duly-obtained contractual right that somehow limits or restricts the actions that a corporation otherwise would take, does not become, without more, a 'controlling

any specific transactions presented to or rejected by the Board.[59]  To support a decision-specific control theory, at a minimum, a plaintiff must identify a decision or transaction.

As to the second, CTT argues that the Breslows, through Wasserman, forced Klein's termination.  According to the Amended Complaint, Wasserman gained control over Klein's Board designee, Adams, "through false representations."[60]  This decision assumes for the sake of argument that false representations can contribute to a finding of control.  For this theory to work, at a minimum, the plaintiff must plead false representations.[61]  The Amended Complaint does not allege any false representations in non-conclusory fashion.  Thus, the Board's decision to terminate

---

shareholder' for that particular purpose"), *and Basho*, 2018 WL 3326693, at *26 (listing as one source of control "the exercise of contractual rights to channel the corporation into a particular outcome by blocking or restricting other paths").  *See also* Da Lin, *Beyond Beholden*, 44 J. Corp. L. (forthcoming 2019) (arguing for a nuanced conception of control that takes into account multiple sources of influence); Mark Nuccio & Gideon Blatt, *Proposed Changes for the Federal Reserve's Control Analysis*, Harvard L. School Corp. Governance and Fin. Regulation Blog (May 1, 2019), https://corpgov.law.harvard.edu/2019/05/01/proposed-changes-for-the-federal-reserves-control-analysis/ (proposing multi-factor control analysis that takes into account, among other things, contractual sources of a controlling influence).

[59] CTT alleges that Wasserman supposedly "refused to allow the Board . . . to *consider* potential investments."  Am. Compl. ¶ 52 (emphasis added).

[60] *Id.* ¶ 62.

[61] Also, those allegations are arguably subject to a heightened pleading standard.  Ct. Ch. R. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

Klein does not give rise to decision-specific control sufficient to impose fiduciary obligations on the Breslows.

It bears noting that, at times, the Amended Complaint appears to contradict itself—both asserting that the Breslows controlled CTT while simultaneously contending that they merely desired control. The Amended Complaint refers to the Breslows' "*quest* for control of CTT," and describes the Breslows as embarking on the campaign "*with the hopes* that [they] could *gain* control of CTT."[62] Although this decision attempts to cut through the Amended Complaint's rhetoric and focus on the facts alleged, the above-quoted statements do sound in truth, as the most reasonable inference from the facts alleged: The Breslows hoped to, but *did not*, control CTT.

In any event, it is reasonably conceivable that the defendants harmed CTT in their unsuccessful "quest."[63] CTT's claims against Wasserman as a fiduciary (discussed above) and the Breslows as alleged aiders and abettors (discussed next) survive the motion to dismiss and will test that theory. But CTT's allegations fail to establish control sufficient to impose fiduciary obligations on the Breslows. The defendants' motion to dismiss Count I as to the Breslows is granted.

---

[62] Am. Compl. ¶¶ 5, 39 (emphasis added).

[63] *Id.* ¶ 5.

**B. CTT's Claim for Aiding and Abetting the Breach of Fiduciary Duties Against the Breslows**

Count II claims that the Breslows aided and abetted Wasserman's breach of his fiduciary duties.[64] The defendants' sole argument in support of dismissal of Count II is that CTT failed to adequately allege an underlying breach of fiduciary duty.[65] Because this decision holds that CTT adequately alleged facts supporting a claim that Wasserman breached his fiduciary duties, the defendants' motion to dismiss Count II is denied.

**C. CTT's Claim for Breach of the Implied Covenant**

Count III contends that the defendants violated the implied covenant of good faith and fair dealing inherent in CTT's Operating Agreement. "The implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[66] "[T]o state a claim for breach of the implied

---

[64] *Id.* ¶¶ 81–87.

[65] *See* Defs.' Opening Br. at 2, 15, 22; Defs.' Reply Br. at 1, 19–20 n.14. *See also Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) ("A third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party 'knowingly participates' in the breach." (citations omitted)); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995) ("A claim for aiding and abetting requires the following three elements:  (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and  (3)  a knowing  participation  in  that breach by  [the non-fiduciary].").

[66] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010); *see also Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 445 (Del. 2005); *Glidepath*, 2019 WL 855660, at *17.

covenant, [a party] 'must allege a specific implied contractual obligation, a breach of that obligation by [the opposing party], and resulting damage to [the party].'"[67] "General allegations of bad faith conduct are not sufficient."[68]

The implied covenant "cannot be invoked where the contract itself expressly covers the subject at issue."[69] "Even where the contract is silent, '[a]n interpreting court cannot use an implied covenant to re-write the agreement between the parties . . . .'"[70] It "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."[71]

CTT proffers two arguments in support of its claim for breach of the implied covenant.

*First*, CTT recycles the allegations of bad faith used in support of the breach of fiduciary duty claims to contend that the defendants violated the implied covenant.[72] In doing so, CTT does not identify any unanticipated developments or gaps in the Operating Agreement that this Court should address by implying terms.

---

[67] *Kuroda v. SPJS Hldgs., LLC*, 2010 WL 925853, at *10 (Del. Ch. Mar. 16, 2010).

[68] *Id.*

[69] *Glidepath*, 2019 WL 855660, at *17 (citing *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE)).

[70] *Id.* (citation omitted).

[71] *Id.* at *20 (citing *Nemec*, 991 A.2d at 1128).

[72] *Compare* Am. Compl. ¶¶ 73–74, *with id.* ¶ 92.

Rather, it merely recasts general allegations of bad faith, which are insufficient to support a claim for breach of the implied covenant.

*Second*, CTT argues that the defendants breached the implied covenant by failing to provide the 105 dental clinic contacts the Breslows promised CTT during the due diligence process.[73] CTT contends that because the Operating Agreement is silent as to the promised contacts, the implied covenant should impose that obligation.[74] The covenant, however, is not intended to imply "a contractual protection when the contract could easily have been drafted to expressly provide for it[,]"[75] especially among sophisticated parties.[76]

As a result, Count III is dismissed.

---

[73] *Id.* ¶ 93.

[74] Pls.' Ans. Br. at 40.

[75] *Glidepath*, 2019 WL 855660, at *17 (citation omitted).

[76] *REJV5 AWH Orlando, LLC v. AWH Orlando Member, LLC*, 2018 WL 1109650, at *3 n.27 (Del. Ch. Feb. 28, 2018) ("Plaintiff's implied covenant position raises red flags since it is difficult to conceive that sophisticated parties engaged in the business of commercial construction, which is inherently fluid, failed to contemplate delays . . . ."), *appeal denied*, 182 A.3d 115 (Del. 2018); *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *6 (Del. Ch. Jan. 29, 2015) ("The Court is hesitant to imply terms not contained in an explicit agreement drafted by sophisticated and experienced parties and their counsel."); *NACCO Indus.*, 997 A.2d at 20 ("These specific provisions, bargained for and crafted by sophisticated parties, leave no room for the implied covenant."); *Cypress Assocs., LLC v. Sunnyside Cogeneration Assocs. Project*, 2006 WL 668441, at *1 (Del. Ch. Mar. 8, 2006) (The Court will not "exercise in after-the-fact judicial contracting . . . in a context where sophisticated parties chose not to take that course when they actually made their bargain. The implied covenant of good faith and fair dealing provides no license for judicial action of that kind.").

## D. Klein's Claim for Tortious Interference with Contract

Count IV alleges that the defendants tortiously interfered with Klein's Employment Agreement. To state a claim for tortious interference with a contract, a plaintiff must allege a breach of that contract.[77]

Klein does not state an independent claim for breach of the Employment Agreement, nor does he allege facts sufficient to support such a claim. Two of three Board members—Wasserman along with one of Klein's own Board designees, Adams—decided to terminate Klein "for cause" from his position as CEO. Klein does not allege that the majority of the Board lacked the authority to terminate the Employment Agreement for cause. Instead, Klein asserts in a conclusory fashion that this decision was unjustified. Klein alleged that the defendants "coopt[ed]" Adams into terminating Klein by "exerting pressure through false representations,"[78]

---

[77] *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *10 (Del. Ch. Sept. 22, 2016) (To state a claim for tortious interference, a plaintiff must show "'(1) a valid contract, (2) about which the defendants have knowledge, (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract, (4) without justification and (5) which causes injury.'" (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987)) (citing Restatement (Second) of Torts § 766 (1979))); *id.* at *11 ("A party cannot claim a tortious interference with contract when there has been no breach of that contract."); *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 713 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004) (dismissing the tortious interference with contract claim when the plaintiff failed to state a claim for breach of contract or the implied covenant of good faith and fair dealing); *Goldman v. Pogo.com Inc.*, 2002 WL 1358760, at *8 (Del. Ch. June 14, 2002) (finding that without a sustainable claim of breach, there can be no viable claim for tortious interference).

[78] Am. Compl. ¶ 62.

but does not allege the nature of the representations or explain how those representations constituted a breach of the Employment Agreement.

Because Klein failed to allege a breach of contract underlying his claim for tortious interference, Count IV is dismissed.

### E.  Klein's Claim for Civil Conspiracy

Klein predicates his claim for civil conspiracy on his claim for tortious interference, alleging that the defendants acted in concert to interfere with Klein's Employment Agreement.[79]  To succeed on a claim for civil conspiracy, "the underlying wrong . . . must be actionable, even without the alleged conspiracy."[80] As established above, the tortious interference claim is not actionable.  Count V is therefore dismissed for lack of a necessary predicate.

## III.  CONCLUSION

For all these reasons, the defendants' motion to dismiss the Amended Complaint is GRANTED as to Count I as asserted against the Breslows, Count III, Count IV, and Count V, and DENIED as to Count I as asserted against Wasserman and Count II.

---

[79] Am. Compl. ¶¶ 103–04.

[80] *Brooks-McCollum v. Shareef*, 2006 WL 3587246, at *3 (Del. Super. Nov. 1, 2006).